IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| DAVID L. GLADWELL, Trustee for Debtor, JAMES C. ZIEGLOWSKY,<br><br>Plaintiff,<br><br>vs.<br><br>ROADWAY PACKAGE SYSTEMS, Inc. NKA RPS, A CALIPER SYSTEM COMPANY,<br><br>Defendant. | ORDER & MEMORANDUM DECISION<br><br><br><br>Case No. 1:01CV143 TC |

Mr. David L. Gladwell, as trustee in bankruptcy for James C. Zieglowsky, filed this lawsuit asserting claims of breach of contract and intentional interference with economic relations. This matter is before the court on a motion for summary judgment submitted by Defendant Roadway Package Systems, Inc. ("RPS"). RPS asserts that Plaintiff cannot prove, as a matter of law, that RPS breached its Operating Agreement with its former contractor, James Zieglowsky, or that it is liable for tortious interference with an existing contract.

**ANALYSIS**

Federal Rule of Civil Procedure 56 permits the entry of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Fed. R. Civ. P. 56(c); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986); Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998). The court must "examine the factual record and reasonable inferences

therefrom in the light most favorable to the party opposing summary judgment." <u>Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.</u>, 912 F.2d 1238, 1241 (10th Cir. 1990).

**Breach of Contract**

In 1993 Mr. Zieglowsky entered into an Operating Agreement with RPS as a Pick-Up & Delivery ("P&D") Contractor covering a service area which he divided into two parts that he called Provo North and Provo South. This agreement was to run for a term of five years. In May of 1996, pursuant to his rights under the Operating Agreement, Mr. Zieglowsky entered into an oral agreement to sell the Provo South service area to Michael Montague. Mr. Montague, on June 13, 1996, entered into a separate P&D Contractor Operating Agreement with RPS covering the Provo South service area. Mr. Zieglowsky continued servicing the Provo North area under his existing Operating Agreement with RPS.

Plaintiff asserts that RPS breached its Operating with Mr. Zieglowsky in four separate ways: (1) by failing to notify Mr. Zieglowsky five days in advance of a reconfiguration of the Provo South and Provo North service areas in violation of Paragraph 5.2; (2) by terminating the Operating Agreement before the expiration of the specified five-year term in violation of Paragraph 11; (3) by violating the assignment provisions specified in Paragraph 18; and (4) by failing to arbitrate Mr. Zieglowsky's claims as required under the Operating Agreement. To resolve Plaintiff's claims, the court must first examine the effect of Mr. Zieglowsky's sale of the Provo South area to Mr. Montague.

It is not disputed that Mr. Zieglowsky and Mr. Montague entered into an oral agreement for the sale of the Provo South service area in May of 1996 and that Mr. Montague began servicing that area on June 17, 1996. This date coincided with the scheduled opening of a Provo, Utah, RPS terminal although the terminal did not actually open until two days later. The

opening of the Provo terminal triggered a reconfiguration of both Mr. Montague's service area and Mr. Zieglowsky's service area.  The resulting reconfiguration apparently resulted in a geographic expansion of the Provo South service area.  The reconfigured Provo South service area was included in Mr. Montague's June 13, 1996 Operating Agreement with RPS.

   Mr. Montague abandoned his service area on June 20, 1996.  Korin Hatcher, RPS' Operations Coordinator for the Provo, Utah distribution facility, contacted Mr. Zieglowsky and asked him to cover the service area abandoned by Mr. Montague.  Mr. Zieglowsky serviced the reconfigured Provo South area until June 27, 1996, when RPS hired another individual for that service area.

   It is clear from the record that Mr. Zieglowsky voluntarily terminated all of his contractual rights and obligations to the Provo South area when he sold it to Mr. Montague.  That transaction was clearly acknowledged and accepted by RPS when it entered into a separate Operating Agreement with Mr. Montague.  The existence and validity of those two agreements is not in dispute.  Here, the question is whether Mr. Zieglowsky and RPS subsequently entered into a separate enforceable agreement regarding the Provo South service area after it was abandoned by Mr. Montague.  Absent the existence of an enforceable agreement regarding the Provo South service area, Plaintiff cannot complain of any breach pertaining to the Provo South service area after June 13, 1996, the date the area was officially transferred to Mr. Montague by RPS.

   It is undisputed that Ms. Hatcher of RPS asked Mr. Zielglowski to cover the Provo South service area after it had been abandoned by Mr. Montague, but this alone is insufficient to constitute the consummation of a new agreement.  From the record, the circumstances and specifics of Ms. Hatcher's request are unclear.  Regardless of Mr. Zieglowsky's perceptions, it is evident that there was no certainty in the terms of his agreement with Ms. Hatcher regarding the

area to be covered (the original Provo South area or the reconfigured version), the duration, or whether service area would be reincorporated into Mr. Zieglowsky's contract.

"It is fundamental that a meeting of the minds on the integral features of an agreement is essential to the formation of a contract.  An agreement cannot be enforced if its terms are indefinite."  Richard Barton Enterprises, Inc. v. Tsern, 928 P.2d 368, 373 (Utah 1996) (citations omitted); see also Valcarce v. Bitters, 362 P.2d 427, 428 (Utah 1961) ("A condition precedent to the enforcement of any contract is that there be a meeting of the minds of the parties, which must be spelled out, either expressly or impliedly, with sufficient definiteness to be enforced."); Nielsen v. Gold's Gym, 78 P.3d 600, 602 (Utah 2003).   If there is "any uncertainty or indefiniteness, or future negotiations or considerations to be had between the parties, there is not a completed contract.  In fact, there is no contract at all."  Condaland v. Oldroyd, 248 P. 1101, 1102 (Utah 1926).  Because of the indefiniteness in the essential terms of any agreement between Mr. Zieglowsky and RPS, there was no enforceable contract between RPS and Mr. Zieglowsky regarding the Provo South service area after the transfer to Mr. Montague.

**Paragraph 5.2**

Paragraph 5.2 of the Operating Agreement between RPS and Mr. Zieglowsky provides: "RPS shall have the authority, upon five work days of prior written notice to Contractor, to reconfigure Contractor's Primary Service Area to take account of customer service requirements. . . ." (Operating Agreement attached as Ex. A to Def. Mem. Supp. Mot. Summ. J. ("Operating Agreement") at para. 5.2).  Plaintiff argues that RPS breached this provision of the Operating Agreement by significantly altering the Provo South service area that he sold to Michael Montague in May of 1996 and also appears to argue that RPS failed to provide five-days notice to Mr. Zieglowsky in advance of the reconfiguration of the Provo North service area.

Provo South Service Area

Mr. Montague signed an Operating Agreement with RPS on June 13, 1996, which delineated an expanded version of the Provo South route he had purchased from Mr. Zieglowsky. (See Montague Operating Agreement attached as Ex. A to Aff. of Korin Hatcher at Addendum 4). The record indicates that the Provo South service area was officially reconfigured on June 17, 1996. By selling the Provo South service area to Mr. Montague, Mr. Zieglowsky relinquished all rights to that service area. Mr. Zieglowsky did not service the expanded Provo South route before selling it to Mr. Montague. The expansion of the Provo South service area had no bearing whatsoever on Mr. Zieglowsky's performance under the Operating Agreement.

Provo North Service Area

It is undisputed that Mr. Zieglowsky retained all rights and obligations to the Provo North service area after his sale to Mr. Montague and continued to service the Provo North area until his voluntary termination in January of 1997. It is also undisputed that the Provo North service area was reconfigured at the same time as the Provo South service area. To the extent that Plaintiff argues that RPS breached Mr. Zieglowsky's Operating Agreement by failing to provide five-days notification in advance of the reconfiguration of the Provo North service area, it is apparent that there remains a factual dispute as to the nature of the breach, if any, and any damages that Mr. Zieglowsky may have suffered as a result.

**Paragraph 11**

Paragraph 11 of Mr. Zieglowsky's Operating Agreement with RPS provides: "This Agreement shall, at the election of the Contractor, as indicated below, continue in full force and effect for an initial term ranging from one to five years from the date this Agreement is signed." (Operating Agreement at para. 11.1). Mr. Zieglowsky elected a five-year term which

5

was to expire on December 29, 1998. (Id.).

As discussed above, when Mr. Zieglowsky sold the Provo South service area to Mr. Montague, he voluntarily relinquished all of his rights and obligations pertaining to that service area. Mr. Zieglowsky never entered into a new enforceable agreement with RPS to reacquire his original rights and obligations after Mr. Montague abandoned the service area. Plaintiff does not dispute that Mr. Zieglowsky voluntarily terminated the remainder of his agreement (covering the Provo North service area) with RPS in January of 1997. There is nothing in the record that indicates that RPS took measures to terminate Mr. Zieglowsky's Operating Agreement before its expiration and therefore RPS did not breach Paragraph 11 of the Operating Agreement.

## Paragraph 18

Paragraph 18 of Mr. Zieglowsky's Operating Agreement with RPS reads:

> This Agreement shall be binding upon and enure to the benefit of the parties to this Agreement . . . . Provided Contractor is in good standing hereunder, Contractor shall, with thirty (30) days' prior written notice to RPS, have the right to assign its rights and obligations hereunder to a replacement contractor acceptable to RPS as being qualified to provide the services of Contractor under this Agreement (the "Replacement Contractor"), and, provided Contractor or Contractor's representative continues to provide service under this Agreement up to the effective date of such assignment, RPS shall thereupon enter into a new agreement with Replacement Contractor on substantially the same terms and conditions herein contained . . . . Any consideration to be paid by Replacement Contractor on account of such assignment shall be strictly a matter of agreement between Contractor (or Contractor's representative) and Replacement Contractor.

(Operating Agreement at para. 18).

It is apparent that RPS complied with its obligations under the Operating Agreement regarding the assignment of rights and obligations and cannot be said to have breached Paragraph 18 of the Operating Agreement. To the extent Plaintiff argues that RPS interfered with Mr. Zieglowsky's right to sell his service area through the expansion of the Provo South service area, the expansion did not occur until after Mr. Zieglowsky relinquished all of his rights to that

6

service area and after Mr. Montague entered into his own Operating Agreement with RPS.

## Failure to Arbitrate

Mr. Zieglowsky has asserted a breach of contract based upon RPS' alleged failure to arbitrate his dispute as required by Paragraph 12.3 of the Operation Agreement which provides:

> In the event RPS acts to terminate this Agreement (which acts shall include any claim by Contractor of constructive termination) and Contractor disagrees with such termination or asserts that the actions of RPS are not authorized under the terms of this Agreement, then each such disagreement (but no others) shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association and judgment upon the award of the arbitrator may be rendered in any court having jurisdiction thereof . . . .

(Operating Agreement at para 12.3).

Under Paragraph 12.3 of the Operating Agreement, the right to arbitration is conditioned upon the termination of the Operating Agreement by RPS. As discussed above, it is apparent that Mr. Zieglowsky voluntarily terminated his Operating Agreement as it applied to both the Provo North and the Provo South service areas. There were no acts by RPS terminating the agreement and triggering its obligation to arbitrate. Absent an obligation to arbitrate, RPS cannot be said to have breached this provision of the Operating Agreement.

## Tortious Interference with Contract

Plaintiff claims that by reconfiguring and enlarging the Provo South service area immediately after Mr. Zieglowsky transferred the area to Mr. Montague, RPS tortiously interfered with his contract with Mr. Montague. Specifically, Plaintiff argues that by enlarging the area transferred to Mr. Montague, RPS knew that Mr. Montague would not be able to service the area and would abandon his contractual obligations to Mr. Zieglowsky.

The tort of intentional interference with economic relations "protects both existing contractual relationships and prospective relationships of economic advantage not yet reduced to

a formal contract." St. Benedict's Development Co. v. St. Benedict's Hosp., 811 P.2d 194, 200 (Utah 1991) (citing Leigh Furniture and Carpet Co. v. Isom, 657 P.2d 293, 302 (Utah 1982)).  In order to succeed on a claim of intentional interference with economic relations, Plaintiff must prove: "(1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) for an improper purpose or by improper means, (3) causing injury to the plaintiff."  Leigh Furniture and Carpet Co. v. Isom, 657 P.2d 293, 304 (Utah 1982) (emphasis added).  "A party is subject to liability for an intentional interference with present contractual relationships if he intentionally and improperly causes one of the parties not to perform the contract . . . ."  St. Benedict's Development Co. v. St. Benedict's Hosp., 811 P.2d 194, 201 (Utah 1991) (emphasis added).  See also Pratt v. Prodata, Inc., 885 P.2d 786, 788 (Utah 1994); ProMax Development Corp. v. Mattson, 943 P.2d 247, 254 (Utah App. 1997).  Plaintiff must demonstrate that RPS' purpose was to injure Mr. Zieglowsky and that "ill will predominated over all legitimate economic motivations."  Pratt, 885 P.2d at 788; Leigh Furniture and Carpet Co. v. Isom, 657 P.2d 293, 307 (Utah 1982).[1]

In the present case, Plaintiff has asserted that Jim Herbert, the Terminal Manager at the

---

[1] Plaintiff cites to Jones v. Intermountain Power Project, 794 F.2d 546 (10th Cir. 1986) for the proposition that interference with an existing contractual relationship dictates a lower legal burden than interference with a prospective economic relationship.  Plaintiff specifically quotes the portion of the decision which reads:

> In the instant case, we deal with the tort of interference with an existing contract. In [Leigh], the court noted that its prior decisions placed a lighter burden on a plaintiff with respect to this tort, which does not require the plaintiff to prove that the defendant acted with an improper purpose or by improper means. With regard to interference with an existing contract, the [Leigh] court said that a plaintiff need only prove a prima facie case of liability, i.e., that the defendant intentionally interfered with the plaintiff's existing contractual relations. "[T]he burden of going forward then shifts to the defendant to demonstrate as an affirmative defense that under the circumstances his conduct, otherwise culpable, was justified and therefore privileged."

Id. at 544 (citation omitted).  Plaintiff's reliance on Jones, however, is misplaced.  The sentence following that portion of Jones quoted by Plaintiff reads in part: "we need not reach the issue whether the burden of proof in an action for intentional interference with prospective economic relations applies to a cause of action for intentional interference with existing contractual relations."  Id.  Plaintiff has not directed the court to a single case which mandates the imposition of a lesser burden on claims for interference with an existing contract than for prospective economic relations.

Provo terminal, wanted to get rid of Zieglowsky. (See Pla. Mem. Opp. Mot. Summ. J. at para. 71-72).[2] This statement, however, does not support an inference that RPS sought to interferes with Mr. Zieglowsky's contract with Mr. Montague. There is nothing in the record indicating that RPS interfered with Mr. Zieglowsky's contract with Mr. Montague for an improper purpose or through improper means.

## ORDER

For the reasons set forth above, RPS's motion for summary judgment is GRANTED IN PART and DENIED IN PART. The only issue remaining is whether, and to what extent, RPS breached Paragraph 5 of its Operating Agreement with Mr. Zieglowsky as it applies to the reconfiguration of the Provo North service area.

SO ORDERED this 9th day of August, 2005.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
United States District Judge

---

[2] Plaintiff has directed the court to the testimony of Steve Lawyer, the individual who was hired to cover the Provo South service area after it was abandoned by Mr. Montague, in support of this proposition. The court notes that the portion of the Mr. Lawyer's testimony to which the court has been directed applies to perceptions of Mr. Zieglowsky's performance after he was no longer associated with RPS, not regarding RPS' intent before Mr. Zieglowsky voluntarily terminated his Operating Agreement. (See Deposition of Steve Lawyer, attached as Ex. D. to Pla. Mem. Opp. Def. Mot. Summ. J. at 69-74).